### RANCO, Inc., v. GWYNN et al.

### No. 8960.

Circuit Court of Appeals, Sixth Circuit.

June 5, 1942.

Warren H. F. Schmieding, of Columbus, Ohio (Warren H. F. Schmieding and Webb I. Vorys, both of Columbus, Ohio, on the brief), for appellant.

John W. Malley and William M. Cushman, both of Washington, D. C. (John W. Malley and Wm. W. Cushman, both of Washington, D. C., and William S. Babcock, of Columbus, Ohio, on the brief), for appellee.

Before SIMONS, MARTIN, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

This appeal is from a decree holding appellant guilty of infringement of a patent, and granting an injunction and an accounting. In this case, William A. Gwynn is hereinafter referred to as the appellee, the other parties so designated in the pleadings, being joined because of contractual relations with him. On review, the principal contention of appellant is that the three claims in suit are invalid for lack of invention; that appellee's patent is merely a copy of old devices, included in the prior art; and that appellant did not infringe.

Appellee's device, patent No. 2,009,549, is for repairing inner tubes of automobile tires, and for attaching rubber valve

stems to the tubes by vulcanization. It is well known that a valve stem is used as part of an inner tube of an automobile tire. In the end of the valve stem is placed a small metal insert, which contains a valve core. The valve core comprises a barrel, having a small outside sleeve of rubber attached to the metal insert, and a rubber cup, which constitutes a seat for the valve. The valves are usually inserted and attached in the ends of the valve stems when they are first manufactured.

Such a valve stem has a disk, patch, or shank of rubber attached around one end. In order to vulcanize or bond the rubber shank of the valve stem to the rubber of an inner tube, the two separate surfaces of rubber must be held together and heated to a high temperature. This is the purpose of the device on which appellee Gwynn secured a patent, and can, as far as this case is concerned, be described as a hollow metal block with a hole in it. In the hollow part of the block is an electric heater. The block rests upon a base, to which are attached legs, leaving an air space between the block and a table or bench upon which the device may rest.

The manner in which the vulcanizing is performed is that the valve stem is inserted in the hole of the metal block, with the rubber shank attached to the end of the valve stem, lying flat on the upper surface of the metal block. The rubber tube is then held against the rubber shank of the valve stem, and the electric wires of the heater cause the surface of the block to become heated, which, in turn, heats the surfaces of the rubber to such temperature that they become bonded or coalesced.

In brief, appellee claimed that he had invented a vulcanizing device in which a valve stem extended through a hole in the vulcanizing block and beyond the underside of its base, sufficiently beyond a heating unit in the block, to avoid excessive heating of the outer end portion of the valve stem, and that the device was also arranged to concentrate heat on the vulcanizing surface immediately adjacent to the hole through which the valve stem extended. The extension of the end of the valve stem through the block, beyond the heating unit and beyond the underside of its base, is alleged to protect the valve core, contained within the end of the valve stem, from excessive and injurious heat during the vulcanizing operation.

The District Court found that Gwynn had invented a small, light, cheap, portable, quickly and economically operated, electric vulcanizer for attaching rubber valve stems to inner tubes in such a way as to protect the stems, as well as the rubber valve cores therein used, from excessive heat during the vulcanization; and that he was the first to combine these elements, solve the problem, and achieve the results sought.

The patent in suit is in the crowded portable vulcanizing art; Shaler Co. v. Rite-Way Products, 6 Cir., 107 F.2d 82, and in reviewing appellant's contentions that appellee's patent is invalid, as lacking invention and including only an aggregation of old elements, we consider certain of the prior patents, to which reference is made, and other devices which have been long in use, and which, it is claimed, fulfill the same functions as the patent in suit.

The Kremer device, patent 1,078,097, consists of a mold, divided into an upper and a lower section, for "splicing or vulcanizing rubber tubes and the like." Apparently, before 1925, inner tubes were made by first wrapping rubber on a mandrel and then taking this length of tubing and joining the ends together by vulcanization—thus making a circular, continuous tube. The Kremer device was adapted to this purpose. The tubing was placed in the mold, with the ends, as stated by appellee, "suitably treated and united by telescoping or otherwise." On each side of the part of the tube to be vulcanized, the upper part of the mold locked down tightly on the tubing. Through the lower mold, there was a hole through which the valve stem of the tube protruded. Through this valve, the portion of the tube in the mold was inflated, the tube being pinched down on each side of the place to be spliced. Only that portion of the tube adjacent to the ends which were to be joined, was inflated, causing it to be pressed against the mold. Around the mold, at the point of splicing, were hollow chambers, into which steam was introduced. By this heat, the ends of the tube were vulcanized. At the same time, the rubber patch or shank of the valve was vulcanized to the tube. Appellant contends that the patent in suit was copied from the Kremer patent, in so far as it was a device, in which the valve stem protruded through a hole, remote from the vulcanizing surface, during the operation of vulcanizing a valve stem

patch to a tube. Appellee emphasizes that the Kremer device was used to vulcanize the shanks of metal valve stems; that there was no concentration of heat at the point of such vulcanization; and that the device was large and bulky, and not inexpensive, portable, light, and quickly operated, as is appellee's device.

The Kuhlke patent, No. 1,652,366, is for a device to vulcanize inner tubes, and consists of a mold for vulcanizing raw rubber into the shape of a tube. There is an aperture in the mold, through which the valve stem protrudes into the open air. Witness Keltner testified that as far back as 1930, the apparatus, with a slightly enlarged aperture, had been used to vulcanize rubber valve stems to inner tubes. The heating medium was steam and the device was large and heavy, and not adapted to quick application of the valve stems to inner tubes. Both the Kremer and Kuhlke devices are criticized by appellee on the ground that, in both, there was a failure to concentrate heat for vulcanizing a valve stem, and that application of vulcanizing heat to the entire surface of the tube enclosed within the mold, merely to attach a valve stem, would result in deterioration to the tube, after its first vulcanization in manufacture.

The Oppenheimer patent, No. 1,323,544, consists of a hollow metal chamber, heated by steam, with an aperture in its center to permit the insertion of a straight valve stem. The valve stem extended into an enclosed space, surrounded by the steam chamber. The shank of the stem rested upon the vulcanizing surface and the tube was clamped upon this shank. The Ryan patent, No. 1,579,490, was an improvement on the foregoing, being adapted for a bent valve stem.

The Campbell patent, No. 1,587,282, is for an electric tube plate vulcanizer, with a hole in the metal heating plate, in which the valve stem is inserted, protruding at the bottom of the plate into the open air. Vulcanization between the shank of the stem and the tube resulted when they were clamped down on the heating surface. Appellee argues that the heat was not concentrated at the point of vulcanization, as in his device, and to heat the entire plate would require considerably more electric current than is necessary in the patent in suit. It is also contended that the Campbell device does not purport to vulcanize rubber stems to inner tubes. But the so-called Moll vulcanizer, concerning which testimony was introduced, was modeled on the Campbell device, and satisfactorily vulcanized rubber valve stems to inner tubes.

The Gold Nugget vulcanizer, a photograph of which was introduced in evidence, included a metal block, flat on its upper vulcanizing surface, and heated by steam. In the center of the block, a hole was drilled to permit insertion of a valve stem. The method of vulcanization was similar to that of the other devices, but the valve stem, during the operation, was completely surrounded and enclosed by the heated metal block.

C. L. Sweazy, a tire repair man and a witness for appellant, testified that he had vulcanized rubber shanks of valve stems to inner tubes, from 1931 on, by a practical make-shift method similar to the patent in issue. On the flat surface of a steam chamber, he had merely placed a small, solid metal pulley wheel, with a hole through its center. The sides of the pulley were flat. Through the hole in the pulley, he inserted the valve stem, leaving the shank lying flat on the top surface of the pulley. The inner tube was pressed down against the valve shank at the point where it was desired to vulcanize. The steam was turned on in the heating chamber, which, in turn, heated the metal pulley and caused the rubber pressed against its top surface to become vulcanized. Sweazy used this method with rubber valve stems, as well as those of metal.

Ora Forgette, a tire dealer and vulcanizer, testified that when rubber valve stems came into use in 1930, in answer to his question to a tire salesman as to how they could be vulcanized to tubes, he was told to get an aluminum block, drill a hole in it, place the block on a heating plate—"regardless how it is heated"—insert the valve stem in the hole, clamp the tube down onto the valve shank, and apply the heat to the plate, heating the aluminum block, and causing the rubber on its upper surface to become vulcanized. In using this method, the valve stem was entirely surrounded by metal during the vulcanizing process.

The Seelye patent, No. 1,515,177, is a small, portable, hollow, metal block, containing a circular electrical heating unit below the vulcanizing surface, and concentrating heat at the point of vulcanization. There was, however, no hole in the

block, and it was not adapted for the vulcanization of valve stems to inner tubes.

In the application for his patent, appellee Gwynn stated:

"As is well known, heat is inimical to the life of rubber, and heretofore, so far as I am aware, no means have been devised which will enable the base of a rubber valve stem to be securely vulcanized to the tube without at the same time applying an objectionable degree of heat to the outer end of the valve stem containing the valve, and thus weakening or softening the rubber so that leakage around the valve will occur.

"It is the object of my invention, therefore, to provide a simple and economical vulcanizing device which will permit the proper degree of heat to be applied uniformly to all parts of the rubber base while the latter is held under pressure in contact with the inner tube, and at the same time avoid the danger of applying an objectionable degree of heat to the outer end portion of the valve stem enclosing the valve."

The claims in suit describe a device with a thickness of the metal vulcanizing block such that the outer end of a valve stem will extend through a hole in the block and beyond the underside of its base,—and "such that the valve stem extends sufficiently beyond the heating unit to avoid excessive heating of the outer end portion of the valve stem." Claim No. 4 provided for a heating unit "being disposed to concentrate the heat over a localized area of vulcanizing surface immediately adjacent to said openings (the holes through surfaces of the block) whereby to connect effectively the valve stem to the tube during the vulcanizing operation."

It was not new to extend the end of a valve stem through a hole in the vulcanizing plate or block, remote from the heat of the vulcanizing surface. This was done by Kremer, Campbell, Kuhlke, Oppenheimer and Ryan; and it was not new so to extend the end of the valve stem into the open air, as this had been done by Kremer, Campbell, and Kuhlke.

Concentration of heat at the point of vulcanization by means of a circular electric heating unit in a recess in the block below the vulcanizing surface, had been accomplished by Seelye, although his device did not have a hole in which to insert a valve stem, so that it could be vulcanized to an inner tube. In his application for a patent, appellee stated that, while he used an electrical heating unit as shown in his drawings, he wished it understood that the claimed invention was not limited to such means of applying vulcanizing heat, and that any other heating means might be employed, which, in operation, applied the heat to the vulcanizing surface "in an area surrounding the stem proper of the rubber valve stem and in a zone substantially removed from the end of the latter, containing the valve." Appellee, therefore, does not claim that his use of the circular electric heating unit, resulting in the concentration of heat on the vulcanizing surface, is patentable by him.

In brief, from the foregoing it is evident that at the time appellee secured his patent, there was nothing new in a vulcanizing device in which a valve stem extended through a hole in a vulcanizing block, beyond the underside of the base of the block, or sufficiently beyond the heating medium in the block, to avoid excessive heating at the outer end portion of the valve stem; and it was not new to concentrate heat on a vulcanizing surface by means of a circular electric heating unit in the block beneath such surface.

The most important contention made by appellee is that his device was the first to concentrate heat on a vulcanizing surface for attaching a rubber valve stem to a tube, in such a way that, during vulcanization, the outer end of the stem (in which was contained the valve core) extended beyond the heating unit and into the open air, and was thus protected against "an objectionable degree of heat." Considerable testimony was introduced with regard to the construction of the valves, and the rubber valve cores, which are inserted in the end of the valve stems; and the purpose of this evidence was to show the danger of causing deterioration of the rubber portions of the valve, if excessive heat is applied to the end of the stem. But while this was most emphatically urged as the problem confronting, and solved by, appellee, there was no evidence that, in vulcanizing valve stems to tubes, valve cores had ever been injured by excessive heat, by any methods theretofore used. Sweazy, using a solid metal pulley wheel with a hole in it, had inserted the rubber valve stem in the hole and vulcanized the shank of the stem to the inner tube by heating the pulley wheel and pressing the tube down on the shank, which lay flat on

the surface of the pulley. With this method, the heat had come from the steam chamber on which the pulley rested. The heat was greater at the surface of the heating chamber and at the bottom of the pulley, than it was on the upper vulcanizing surface of the pulley. The end of the valve stem remote from the vulcanizing surface was at the bottom of the hole in the pulley. It was surrounded by the heated metal block, and nearer the source of heat than the vulcanizing surface. During vulcanization by this method, the end of the valve stem often touched the surface of the heating chamber, but no injury resulted to the end of the stem or to the valve core inserted therein; and Forgette, with his perforated aluminum block, resting on a heating plate, vulcanized rubber stems to tubes in the same way, without injury to the valve cores. No damage resulted to valve cores in stems vulcanized to tubes by the Gold Nugget device, although the stem was completely surrounded by the heating medium. In the many methods used in vulcanizing rubber valve stems to inner tubes, as disclosed by the testimony, there is no evidence that any damage ever resulted to the valve cores from excessive heating. On the other hand, there is substantial evidence that none of the many and various methods used caused any damage to such cores. We are bound to conclude that, while excessive heat applied to the outer end of the rubber valve stem would injure the valve core inserted therein, the practical problem of protecting the cores from excessive heat never arose in any of the devices and methods used up to the time appellee secured his patent. There was no evidence that vulcanization of rubber stems to tubes ever resulted in excessive heat being transmitted to the valve cores—even in instances where the valve stem was completely surrounded by the heating medium. Appellee had never encountered the problem as a practical problem. In all of his vulcanizing experience he had never found that a valve core had been injured by the heat applied during the vulcanization of rubber valve stems to tubes, and, as far as the evidence discloses, no one else had. From everything that appears in the record, no one had ever experienced difficulty in protecting the valve cores from excessive heat while vulcanizing rubber valve stems to inner tubes.

One of the reasons why valve stems seem to be uninjured by heat during their vulcanization to inner tubes, appears, from the uncontradicted evidence, to be that when the valve stems are first made, they are not only of a different composition of rubber, but are subjected, in manufacture, to a much higher degree of heat than are the tubes and the shanks attached to the stems. The result of such methods in the manufacture of the stems is that they are harder and firmer than the shanks and tubes; and, consequently, are not revulcanized, or subject to revulcanization, or deteriorated by any subsequent application of the lesser degree of heat required to attach the valve shanks to the tubes.

Appellee emphasized that the Hanson vulcanizer, patent No. 2,163,377, recognized a problem of over-vulcanization of rubber valve stems upon attaching them to inner tubes. This was subsequent to appellee's patent application and was concerned with protecting the valve stems rather than the outer ends of the stems. The reference to the Hanson patent is of little assistance in the disposition of this case, but it can be said that in appellee's device, the heating unit was directly exposed to a circumferential portion of the valve stem without any protection. There is, however, no evidence to show that the problem actually existed in any of the numerous devices of the prior art in actual use, and which were before the trial court. If any difficulty existed, appellant remedied it in its device by an insulating ring around the aperture through which the stem was inserted, thus protecting the stem from the direct heat of the electric coil.

No invention resides in merely changing the form or size of a device, or in merely making it portable or movable; Hendy v. Golden State, etc., Iron Works, 127 U.S. 370, 8 S.Ct. 1275, 32 L.Ed. 207; Thompson v. Boisselier, 114 U.S. 1, 5 S. Ct. 1042, 29 L.Ed. 76; Briggs & Stratton Corp. v. Quick Action Ignition Co., 7 Cir., 93 F.2d 207; Frigidaire Corp. v. General Necessities Corp., 6 Cir., 46 F.2d 58; Ohio Galvanizing & Mfg. Co. v. Mercury Mfg. Co., 6 Cir., 49 F.2d 895; and a somewhat different form of a familiar combination of elements, without achieving new functions or results, is not patentable, even where such changes produce better results; Dunbar v. Myers, 94 U.S. 187, 24 L.Ed. 34. The substitution of an equivalent for one of the parts of an old device is not invention; National Hat Pouncing Mach.

Co. v. Hedden, 148 U.S. 482, 13 S.Ct. 680, 37 L.Ed. 529. Such an equivalent must perform another function by another method of operation; Western Willite Co. v. Trinidad Asphalt Mfg. Co., 8 Cir., 16 F.2d 446; and if all the elements of a claimed invention are found in different prior patents in the art, or in different devices previously in general use, the combination is anticipated, unless a new functional relation arises therefrom; Busell Trimmer Co. v. Stevens, 137 U.S. 423, 11 S.Ct. 150, 34 L.Ed. 719; Loeber Hair Goods Co. v. H. W. Gossard Co., 6 Cir., 87 F.2d 98. Thus, to be patentable, a new combination must produce a result which is the product of the combination, and not a mere aggregation of several results, each the complete product of one of the combined elements; Hartman Furniture & Carpet Co. v. Banning, 7 Cir., 59 F.2d 129, certiorari denied 287 U.S. 659, 53 S.Ct. 121, 77 L.Ed. 560.

Mere skill is not invention; and an adaption of a well-known mechanical expedient is within the expected skill of the art; Shaler Co. v. Rite-Way Products, supra. The test generally applied in distinguishing invention from mechanical skill is whether what was produced was obvious to persons skilled in the art and acquainted with the common knowledge in that art at the date the instrument was created. Hendy v. Golden State, etc., Iron Works, supra. So, a difference, which consists of a mere omission, or something which a skillful mechanic could supply, is not fatal to anticipation. Ideal Stopper Co. v. Crown Cork & Seal Co., 4 Cir., 131 F. 244, certiorari denied 195 U.S. 633, 25 S.Ct. 791, 49 L.Ed. 354. A device used for one purpose may be effective as an anticipation of an invention consisting of the use of a substantially identical art or instrument for another purpose, if the new use be so nearly analogous to the former one that the applicability of the means to its new use would be obvious to persons skilled in the art to which the invention relates; Potts v. Creager, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275; and the fact that a prior patent contains no description of the advantage of using the art or instrument which it discloses in the way pointed out by the latter invention, does not deprive it of effect as an anticipation; Consolidated Bunging Apparatus Co. v. Metropolitan Brewing Co., 2 Cir., 60 F. 93. The application of an old method or device to a similar or analogous subject, with no change in the manner of applying it, and no result substantially distinct in its nature, is not invention; Miller v. Foree, 116 U.S. 22, 6 S.Ct. 204, 29 L.Ed. 552; Johnson Co. v. Toleda Tract. Co., 6 Cir., 119 F. 885; Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856; Excelsior Steel Furnace Co. v. Williamson Heater Co., 6 Cir., 286 F. 131; Keene et al. v. New Idea Spreader Co., 6 Cir., 231 F. 701; Overweight Counterbalance Elevator Co. v. Henry Vogt Machine Co., 6 Cir., 102 F. 957; nor is it invention to combine old devices into a new machine or manufacture or design, without producing any new or different function or operation; Detroit Stoker Co. v. Brownell Co., 6 Cir., 89 F.2d 422. Mere combination of a multiplicity of elements does not make a device patentable. Richards v. Chase El. Co., 158 U.S. 299, 15 S. Ct. 831, 39 L.Ed. 991; and where an inventor simply rearranges or readjusts old elements, or uses their equivalents, to make a new structure in which each part operates substantially as in the old, and with the same result, while this may have required the exercise of a high degree of mechanical skill, the result is not invention; Westinghouse Air Brake Co. v. Schwarze Electric Co., 6 Cir., 108 F.2d 352.

It may well be doubted that any patentable utility resides in appellee's device, in the sense that the claimed extension of the valve stem through the vulcanizing block into the open air, overcomes a danger of injurious heating of the valve core. This seems merely a colorable claim. But it is unnecessary to dwell upon this proposition. Compared to prior patents and devices in use, the degree of difference in construction and result is too slight to amount to an invention. See Winters & Crampton Mfg. Co. v. Grand Rapids Brass Co., 6 Cir., 62 F.2d 822. In our opinion, the claims of the patent in suit represent nothing more than an aggregation of old elements within the mechanical skill of the trade, rather than true combinations. See Whiting Corp. v. Manning, Maxwell & Moore, Inc., 6 Cir., 76 F.2d 457.

Appellee's device was a competent, skillful arrangement of elements that achieved results in a better way than any prior device adapted to the purpose. But, as said by Judge Simons in the similar case of Shaler Co. v. Rite-Way Products, supra [107 F.2d 83], "It may well be granted that

Hanson disclosed centering means better serving the purpose of tire repair than the expedients of the prior art, but not every improvement necessarily denotes invention and the adoption of a well-known mechanical expedient is within the expected skill of the art." "We cannot believe that in an art crowded with prior teachings, as here, anything more than the exercise of mechanical skill was involved and conclude that the claims are invalid for want of invention." Speaker v. Shaler Co., 7 Cir., 87 F.2d 985, 986.

The decree of the District Court is reversed.